BRINKMAN *v.* PEEL.

5-139                                   260 S. W. 2d 448

Opinion delivered June 29, 1953.

Rehearing denied October 5, 1953.

*Perkins* and *Duty,* for appellant.

*Vol. T. Lindsey* and *Jeff R. Rice,* for appellee.

GRIFFIN SMITH, Chief Justice. In March, 1951, William H. Brinkman and his wife, as joint tenants, purchased a farm in Delaware county, Oklahoma, for $45,000, and thereafter spent appreciable sums rehabilitating and improving it. Within less than six months the place was listed with eight or ten realtors for sale at $65,000. Possession was surrendered to F. S. Cochran about the first of November. Cochran purchased through Clifford Black, a Rogers realtor. The Cochran contract was closed during the afternoon of October 15th and the price paid and to be paid was $60,000. A check for $5,000 was given as the down payment.

This appeal is from a judgment for $3,000 in favor of Terry Peel, a Bentonville realtor, with whom the Brinkmans had the farm listed. Peel's contention is that preliminary discussions had taken place between representatives of his office and J. T. McKinney, and that on the morning of October 15th, or shortly afternoon, difficulties were eliminated, resulting in a firm offer of $60,000 by McKinney and an acceptance by Brinkman. McKinney, who lived in Texas, had inspected the property and attempted to buy it at a price substantially lower than the listed figure. He also specified that a large deep freeze unit and other personal property were to be included. It is not disputed that the Brink-

mans refused McKinney's first offer, evidenced by a telegram dated October 12th. But Peel, through use of the telephone, persuaded McKinney to drop his stipulation regarding the deep freeze; thereupon Peel or those representing him discussed details with Brinkman before noon October 15th. During these conversations Brinkman refused to include the deep freeze; but he admits that while in Peel's office there were telephone conversations with McKinney and that he (Brinkman) participated in the exchange of views. Following these conversations Peel had his attorney draw up a contract reflecting, as Peel testified, the final offer made by McKinney and its acceptance by Brinkman. Prior to Brinkman's arrival at Peel's office there had been long distance conversations with the prospective purchaser.

Joe Johnson, one of Peel's salesmen, had talked with McKinney. After receiving McKinney's telegram Johnson went to Oklahoma and saw Mrs. Brinkman. Her husband was temporarily absent. Mrs. Brinkman told Johnson she would have Brinkman go to Peel's office the next day. When Brinkman reached the realtor's office the morning of the 15th he told Johnson to go ahead and accept McKinney's offer of $60,000, $10,000 to be paid in cash and possession to be given January 1. Originally the cash payment had been tentatively discussed with the idea that 10%, or $6,000, would be paid, with possession December 1.

Johnson testified that, after receiving McKinney's authorization, the final offer was explained to Brinkman, who said, "We'll just go ahead and enter into a contract on those terms". Jeff Rice, an attorney representing Peel, was informed of the essentials and told to prepare the instrument.

Before discussions were closed Brinkman received a telephone call from Black's office. According to Brinkman, Black told him he was with Cochran at the Harris Hotel in Rogers. Brinkman says he kept the appointment at 12:30 and while there sold the property to Cochran for about $3,000 more than McKinney had

offered. After accepting Cochran's offer they left at two o'clock to go to the farm, Cochran and Black in "their" car, and Brinkman in his truck. Brinkman went by Bentonville, was again in contact with Peel's office, took the original contract and two copies, and left. The cross-examination of this witness discloses his attitude:

Question (by counsel for Peel): "[Mr. Brinkman], after you had been to Rogers (these folks had been dealing with you all morning and [had] gone into a contract [after making telephone calls]—you went there and accepted a deal with Black? A. That's right.

"Q. Then you came back and picked up the contract and didn't tell them [about selling to Cochran]? A. That's right.

"Q. Why didn't you tell them? A. What difference does it make? . . .

"Q. Why didn't you tell them that Black had sold it—had found a buyer—and that you had already sold to Mr. Cochran? A. I just didn't think about it".

Brinkman denied that in picking up the abstract he told Peel or his representative that it would be returned the next morning with a deed. The witness admitted that Peel's agents saw him in November, and at that time he had not disclosed that a sale had been made through Black.

Brinkman's defense is that he did not agree to all of the terms exacted by McKinney, therefore there was no meeting of the minds. It is not seriously urged that McKinney was not ready, able, and willing to buy, or that the method of payment was unsatisfactory.

The cause was tried before Judge Cummings, a jury having been waived. As a prerequisite to factual findings in favor of Peel it was necessary that the evidence preponderate in his favor; but we affirm if there was substantial evidence tending to support appellee's contentions.

The law is that as between realtors who have non-exclusive listings, the agent first producing a buyer

whose offer meets the seller's terms has earned his commission. Certainly there was testimony legally sufficient to establish McKinney's offer, the discussions by telephone, the submission of McKinney's proposals to Brinkman, and his acceptance. When Brinkman went to Peel's office the morning of October 15th he had his abstract of title and temporarily left it with the real estate agency.

The explanation by Brinkman that he merely received the offers with the intention of discussing the proposals with his wife was not accepted by the trial court and must be rejected here. Paraphrasing an excerpt from *Balser* v. *Ramseur*, 209 Ark. 150, 189 S. W. 2d 785, ''There is a question of fact which we think the record presents, and that is whether Peel advised Brinkman that he had procured a purchaser before Brinkman closed with Cochran through Black. If Brinkman was advised that Peel had procured McKinney as a purchaser before permitting another agent to sell, Brinkman is liable to Peel for the commission, although he may also have paid or become liable to pay Black a commission''. In the Balser-Ramseur case the agency was exclusive.

The general rule of liability is that a realtor has earned his fee when, in response to the seller's agreement to dispose of the property under terms sufficiently clear for identification of the subject-matter, the method of payment, and other details, a purchaser ready and willing to buy and able to pay is produced. *Bowen* v. *Riggan,* 218 Ark. 244, 235 S. W. 2d 967.

A second objection is that the court erred in not dissolving an attachment by which an automobile was taken into custody by the sheriff of Benton county. Brinkman contends that the car was his wife's property and that she was not a party to the contract for sale of the farm. Disregarding the suggestion that Brinkman was his wife's agent in the real estate transaction, we have testimony from which the court was justified in finding that the automobile belonged to appellant. Fol-

lowing the attachment Brinkman executed a retention bond, with the U. S. F. & G. as surety. The car was released to William H. Brinkman when he produced and exhibited to the sheriff a bill of sale showing his individual ownership. There was no objection when the sheriff testified to this transaction.

Affirmed.